UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DONALD A. DEW, an individual,<br><br>                 Plaintiff,<br><br>v.<br><br>DIRECTOR KENNETH D.<br>EDMUNDS; PAMELA P. PARKS<br>and JOHN/JANE DOES I through X,<br>whose true identities are presently<br>unknown,<br><br>                 Defendants. | Case No. 1:15-cv-00149-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court is Defendants' Motion to Dismiss. (Dkt. 19.)  The matter has been fully briefed and is ripe for the Court's consideration. The Court conducted a hearing on September 22, 2015, and thereafter took the motion under advisement. Having fully reviewed the record and considered the parties' respective arguments and applicable legal authority, the Court enters the following order granting the motion, with leave to amend.

## BACKGROUND

Plaintiff Donald Dew's complaint, filed on May 1, 2015, and later amended on May 7, 2015, asserts various civil rights violations committed by Kenneth Edmunds, the Director of the Idaho Department of Labor (IDOL), and Pamela Parks, the Administrator of the Idaho Commission on Human Rights (ICHR). (Dkt. 1, 4.) Both Edmunds and Parks are sued in their individual capacities for alleged violations of Dew's civil rights under 42 U.S.C. § 1983. The factual background alleged in the Amended Complaint is taken as true for purposes of the pending motion.

In June of 2014, Dew applied for the position of ICHR Administrator. Am. Compl. ¶ 15 (Dkt. 4). On July 23, 2014, Dew participated in a video conference interview with Parks and four of the nine ICHR Commissioners—Estella Zamora ("Commissioner Zamora"), Brian Scigliano ("Commissioner Scigliano"), Joe McNeal ("Commissioner McNeal"), and Andrea Wassner ("Commissioner Wassner") (collectively the "Commissioners"). *Id*. at ¶ 18.

On August 26, 2014, Parks and the same ICHR Commissioners called Dew for an impromptu conference call phone interview to discuss the position further. *Id*. at ¶¶ 27-35. Dew contends that, during the telephone interview, the Commissioners and Parks asked him questions, such as his salary requirements, how long before he could start if offered the position, and about his mediation training. *Id.* at ¶¶ 29-33. At the conclusion of the interview, which lasted approximately thirty minutes, Parks asked Dew if he could come to Boise for an in-person interview. *Id.* ¶¶34-35. Dew agreed to travel to Boise,

Idaho, from Sioux City, Iowa, for an interview, and the ICHR arranged for Dew to fly to Boise on Thursday, September 4, 2014, and return home on Sunday, September 7, 2014. *Id.* at ¶¶ 36-39.

On September 4, Dew first met with Parks and Commissioners Zamora, McNeal, and Scigliano for a little over an hour. *Id.* at ¶ 43-44. Dew allegedly was asked by Commissioner McNeal "what salary he would accept, when he could start, and what his commitment to the position would be." *Id.* at ¶45-46. Also during the meeting, Dew learned the relationship between the ICHR and the IDOL was complex, and the IDOL oversaw the ICHR and had control over its budget. *Id.* at ¶ 48. Dew learned also that he would be meeting with Edmunds and Jay Engstrom, the Deputy Director of the IDOL, at the conclusion of the interview. *Id. ¶¶55.* As Commissioner McNeal left the interview, he allegedly shook Dew's hand and told Dew that he hoped to see him next month in "that chair," indicating Parks's chair, and told Parks that "you know what my vote is" in front of Dew and the others, leaving Dew with the impression that Commissioner McNeal was voting yes to hire Dew. *Id.* ¶¶52-54.

After the interview concluded, Parks escorted Dew to meet with Edmunds and Engstrom. *Id.* at ¶ 57. Dew contends Edmunds's demeanor was unfriendly from the beginning of the meeting. *Id.* at ¶ 60.  Edmunds questioned Dew about ReachOut USA, an organization Dew started in 2007 to help LGBT individuals with disabilities. *Id.* at ¶ 71. Dew contends Edmunds's mention of ReachOut USA multiple times throughout the meeting made Dew aware that including ReachOut USA on his resume was not beneficial. *Id.* at ¶ 72.

**MEMORANDUM DECISION AND ORDER - 3**

Dew asserts that next, Edmunds told Dew he needed to look over gaps in Dew's employment. *Id*. at ¶ 73. When Edmunds asked Dew about a two-year gap in employment beginning in 2004, Dew explained he had a series of infections that caused him to have an uncontrolled seizure disorder, which forced Dew to file for disability. *Id*. at ¶¶ 76-78. Dew alleges that, after he answered the question, Edmunds's "facial expression contorted like he smelled a dirty diaper." *Id*. at ¶ 79. Dew asserts he saw "a look of disgust" on Edmunds's face. *Id.* at ¶ 80. Dew contends that Edmunds then asked "in an incredulous tone" if Dew could even work a 40 hour week. *Id*. at ¶ 81. Dew stated he could work a 40 hour week and did so at his current job, he had not experienced a seizure in three years, and he would not have applied for the position if he did not think he could do the job. *Id*. at ¶¶ 83-86.

According to Dew, after he disclosed his seizure disorder, Edmunds's "tone and questions were noticeably different," Edmunds's tone was "condescending," and he began treating Dew like Dew was "beneath him or a lesser person." *Id*. at ¶¶ 86-87. Dew contends Edmunds's reaction to Dew's disclosure of the seizure disorder was as if Edmunds believed Dew's mental faculties were "dimmed" because of the disorder. *Id*. at ¶ 90. Dew contends he noticed the change in Edmunds's demeanor because Edmunds's reaction was familiar to Dew, as he previously has experienced how others have treated him like a lesser person or have become uncomfortable once he mentioned his seizure disorder. *Id.* at ¶¶88-89.

After the meeting with Edmunds, Edmunds asked Engstrom and Parks to accompany him to his office to discuss Dew while Dew waited in the conference room.

**MEMORANDUM DECISION AND ORDER - 4**

*Id.* at ¶ 91. After approximately thirty minutes, Parks returned to the conference room, and said, "Oh, you are still here? I will take you downstairs." *Id.* ¶ 92-93. Dew felt surprised by Parks's question and confused about what was happening. *Id.* ¶ 94-95. Parks escorted Dew downstairs to the front of the IDOL building at approximately 6:00 p.m., thanked Dew for traveling to Boise, and informed him that the Commission would have to meet again, and that it could take about a week for that meeting to occur. *Id.* at ¶¶96-97.

Dew contends that, upon arriving back to his hotel, he "felt confused and belittled by Director Edmunds's attitude and actions toward him," and felt that Edmunds was antagonistic and had his mind made up before the interview began. *Id.* ¶ 102-103. Dew was hoping Parks would contact him so Dew could make "some sense of what had transpired during his interview" with Edmunds, and that when he heard nothing, he became frustrated and angry, and decided to reschedule his return flight home. *Id.* at ¶¶ 104-108.

Dew asserts he was so distraught by Edmunds's "discriminatory treatment" and biases that Dew sent an email to Parks on September 8, 2014, withdrawing his application from consideration. *Id.* at ¶¶ 116, 119. Dew asserts that he knew Edmunds's biases made it an "exercise in futility" to keep his application in the consideration process. *Id.* at ¶ 117.

With regard to Parks, Dew asserts that, after withdrawing his application from consideration, he obtained copies of all relevant documents from the interview process, including notes containing information Parks received from Dew's references. *Id.* at ¶

**MEMORANDUM DECISION AND ORDER - 5**

124. Dew asserts the notes revealed that two of Dew's references discussed Dew's disability with Parks, and that one reference, Karen Mackey, allegedly made multiple statements about Dew's disability and status as a gay man. *Id.* at ¶¶ 125-26. Dew later sent a copy of these notes to Mackey, who advised Dew that the notes contained multiple inaccuracies. *Id*. at ¶¶127-28. Mackey told Dew she most likely used the phrase "in a relationship" during the reference interview with Parks, but Mackey never said Dew was in a gay relationship; therefore, Parks must have added the word "gay" to the notes. *Id*. at ¶ 128-29.

The Amended Complaint contains five counts. Count I alleges discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*., and Idaho Code §§ 67-5909(1) and 67-5901, on the grounds that Dew suffered an adverse employment action by having the position he applied and interviewed for made unavailable to him because of his disability. Specifically, Dew alleges that Edmunds's bias toward Dew during the September 4, 2014 interview resulted in the loss of opportunity for Dew to compete for the open Administrator position, and that he was denied the fair opportunity to continue competing for the position.

Count II alleges discrimination in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, and Idaho Code §§ 67-5901 and 67-5907(1), on the grounds that Dew was denied the opportunity to fairly compete for the open Administrator position despite his qualifications because of unlawful sex discrimination based on sexual stereotyping. Dew relies upon Edmunds's negative comments regarding Dew's involvement with ReachOut USA, an advocacy organization for LGBTQ and

disabled individuals, and Parks's reference to Dew's sexual orientation in her reference inquiry notes.

Count IV alleges violation of the Equal Protection Clause of the Fourteenth Amendment, on the grounds Defendants deprived Dew of his right to equal protection by discriminating against him on the basis of disability in the hiring process. Count V alleges violation of the Equal Protection clause on the grounds that Edmunds and Parks deprived Plaintiff of the opportunity to compete and be fairly considered for the Administrator position with the ICHR and of his right to equal protection of the law by discriminating against him on the basis of his sexual orientation. And finally, in Count III, Dew alleges negligent infliction of emotional distress.

Dew concedes that Count IV is foreclosed because the ADA provides the exclusive remedy for disability discrimination in the employment context. Count IV will therefore be dismissed.

## DISPOSITION

### 1.    Motion to Dismiss Standard

A motion to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a party's claim for relief.[1] When considering a motion to dismiss, the Court's inquiry is whether the allegations in the pleading are sufficient under applicable pleading standards. Federal Rule of Civil Procedure 8(a) sets forth minimum pleading rules, requiring only a "short and plain statement of the claim showing that the

---

[1] A party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint is plausible when the

factual content "allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). This standard does not

require that the misconduct be "probable," but it "asks for more than just a sheer

possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. The Supreme

Court specified that "heightened fact pleading of specifics" is not required, "but only

enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at

570. "Determining whether a complaint states a plausible claim for relief will ... be a

context-specific task that requires the reviewing court to draw on its judicial experience

and common sense." *Iqbal*, 556 U.S. at 662.

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure

12(b)(6), "all well-pleaded allegations of material fact are taken as true and construed in a

light most favorable to the non-moving party." *Wyler Summit P'ship v. Turner Broad.

Sys., Inc*., 135 F.3d 658, 661 (9th Cir. 1998) (citation omitted). However, the Court does

not necessarily assume the truth of legal conclusions merely because they are cased in the

form of factual allegations in the plaintiff's complaint. *See Clegg v. Cult Awareness

Network*, 18 F.3d 752, 754–55 (9th Cir. 1994). There is a strong presumption against

dismissing an action for failure to state a claim. *See Gilligan v. Jamco Dev. Corp*., 108

F.3d 246, 249 (9th Cir. 1997) (citation omitted). "'The issue is not whether a plaintiff will

ultimately prevail but whether the claimant is entitled to offer evidence to support the

claims.'" *Id*. (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) *overruled on other*

*grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982)). Consequently, the Court should not grant a motion to dismiss for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hicks v. Small*, 69 F.3d 967, 969 (9th Cir. 1995) (quoting *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1990)). A claim is sufficient if it shows that the plaintiff is entitled to any relief which the court can grant, even if the complaint asserts the wrong legal theory or asks for improper relief. *See United States v. Howell*, 318 F.2d 162, 166 (9th Cir. 1963).

"[D]ismissal without leave to amend is improper unless it is clear that the complaint could not be saved by any amendment." *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003). The Ninth Circuit has held that, "in dismissals for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv.*, *Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). Additionally, when evaluating a 12(b)(6) motion, judicial review is "limited to the contents of the complaint." *Clegg*, 18 F.3d at 754. However, exhibits attached to the complaint also may be considered. *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480.

## 2.    Legal Standard Under 42 U.S.C. § 1983

Section 1983 is "'not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). To

establish a prima facie case under § 1983, a plaintiff "must adduce proof of two elements: (1) the action occurred 'under color of law' and (2) the action resulted in a deprivation of a constitutional right or a federal statutory right." *Souders v. Lucero*, 196 F.3d 1040, 1043 (9th Cir. 1999) (citing *Parratt v. Taylor*, 451 U.S. 137, 140 (1979)). In other words, to state a claim under § 1983, a plaintiff must allege: "(1) a violation of rights protected by the Constitution or created by federal statute (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir.1991). The threshold inquiry for a § 1983 action is "whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'" *Baker*, 443 U.S. at 140.

3.      **Discussion**

    A.      ***Counts One and Two – Discrimination Under the ADA, Title VII, and the IHRA***

In Dew's fist two counts, he alleges disparate treatment claims under the ADA, Title VII, and the IHRA. To establish a prima facie case of discrimination under the ADA, Dew must show that he: (1) is disabled; (2) is qualified; and (3) suffered an adverse employment action because of his disability. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001).

Under Title VII, an employer may not fail or refuse to hire, or discharge any individual, or discriminate against a person with respect to his "compensation, terms, conditions, or privileges of employment" because of his sex. 42 U.S.C. § 2000e-2(a). To establish a prima facie case of discrimination under Title VII, Dew must establish (1) he belongs to a protected class, (2) he was qualified for the position, (3) he was subjected to

an adverse employment action, and (4) similarly situated individuals outside the protected class were treated more favorably. *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 658 (9th Cir. 2002).

Finally, under the IHRA, it is unlawful "to fail or refuse to hire, to discharge, or to otherwise discriminate against an individual with respect to compensation or the terms, conditions or privileges of employment" because of the individual's sex and/or disability. I.C. § 67-5909; 42 U.S.C. § 2000e-2(a); 42 U.S.C. § 12112. Federal law guides the Court's interpretation of the IHRA. *Hatheway v. Bd. of Regents of Univ. of Idaho*, 310 P.3d 315, 322 (Idaho 2013).

Under all three statutory schemes, Dew must allege facts establishing he suffered an adverse employment action. An adverse employment action is one that "materially affects the compensation, terms, conditions, or privileges of ... employment." *Davis v. Team Electric Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). A bruised ego, however, is insufficient to constitute an adverse employment action. *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 456 (7th Cir. 1994), *cited in Burlington*, 524 U.S. at 761.

Defendants assert Dew's withdrawal of his application on September 8, 2014, precludes him from making a discrimination claim, because the withdrawal of Dew's application prevents a finding of adverse action, an essential element of Dew's prima

facie case. Dew, on the other hand, alleges the hiring process was complete after his interview with Edmunds, and that Edmunds's discriminatory behavior led him to believe the Administrator position was closed to him specifically, thereby denying him the opportunity to fairly compete for the position. In other words, Dew believed the interview with Edmunds was the final step in the application process, despite admitting Parks informed him after his interview with Edmunds that the Commission[2] would need to meet, and it would take one week to do so. Dew relies upon *Ruggles v. Cal. Polytechnic State Univ.*, 797 F.2d 782, 786 (9th Cir. 1986), as support for his position, which discussed elimination of a job opportunity as a basis for discrimination, as well as the futile gesture doctrine explained in *Internat'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 366 (1977).

Dew's novel claim finds no support in the case law reviewed by the Court. Under the facts alleged, Dew seeks to expand the concept of "adverse action" too far. Several district court cases have considered what constitutes adverse action, and all consistently require an affirmative act on the part of the employer. For example, a decision to revoke a conditional offer of employment accepted by the prospective employee constituted an adverse action in *Jones v. Halstead Mgt. Co., LLC*, No. 14-CV-3125-VEC, 2015 WL 366244 at *7 (S.D.N.Y. Jan. 27, 2015). There, the plaintiff received a letter from the prospective employer stating that it had "decided to revoke your conditional offer of

---

[2] By statute, the Commission is composed of nine members appointed by the Governor. Idaho Code § 67-5903.

**MEMORANDUM DECISION AND ORDER - 12**

employment." *Id.* The court therefore concluded the facts alleged were sufficient to support the claim that adverse action had occurred. *Id.*[3]

Here, despite Dew's assertion that his interview with Edmunds was the last step in the process (and despite Dew's admission he knew the Commission was meeting once again), Dew affirmatively withdrew his application from further consideration. Neither Edmunds nor Parks engaged in any conduct that ceased the hiring process as it pertained to Dew. Other than Commissioner McClean's off the cuff remark that "you know what my vote is," and the positive feeling Dew had at the conclusion of the interview with Parks and three of the Commissioners, no one expressly offered (or did not offer) Dew the position.

There can be no adverse employment action where a plaintiff, by his own volition, withdraws his application from further consideration prior to being offered the job. *See Sanchez v. The Univ. of Connecticut Health Care*, 292 F.Supp.2d 385, 394 (D. Conn. 2003) (finding plaintiff did not set forth a prima facie case of discrimination because "she voluntarily withdrew her application"); *Burt v. Nat'l Republican Club of Capitol Hill*, 828 F.Supp.2d 115, 125-26 (D.C. Cir. 2012) (finding chef's failure to complete the final step in the application process, which consisted of a taste test, did not constitute adverse employment action because the plaintiff decided of his own volition not to participate in the taste test).

---

[3] In *Halstead*, the prospective employee was denied the position based upon a credit report obtained by the employer. Although *Halstead* involved an employment claim premised upon violation of the Fair Credit Reporting Act, the Court finds it instructive for its analysis of adverse action.

**MEMORANDUM DECISION AND ORDER - 13**

This Court confronted an analogous factual situation in *Flowers v. City of Parma*, No. 1:14-cv-00453-EJL, No. 18 (D. Idaho Aug. 12, 2015), and found the voluntary acts by the plaintiff precluded a finding of constructive discharge. There, the elected Mayor of Parma contended he was forced to resign in conjunction with stigmatizing statements about conduct he engaged in prior to the election. Several city council members began circulating a Recall Petition. Faced with a potential recall election based upon false criminal charges, Flowers voluntarily resigned from his position as Mayor. Flowers alleged the defendants violated his Due Process rights by making false public accusations of criminal activities he allegedly committed, resulting in his constructive discharge or forced resignation without an opportunity to be heard. The Court disagreed, because it was "Flowers' choice to resign as he was entitled to remain in office pending the outcome of any recall election." Slip. Op. at 16. Accordingly, the Court held Flowers had not alleged any facts or circumstances rising to the level of constructive discharge or coerced resignation, "particularly since the Recall Petition was not finalized before he resigned." *Id.* at 16-17.

Dew alleges he was subjected to discriminatory behavior by Edmunds during his interview, akin to the false accusations levied at Flowers. Dew contends he was humiliated and devalued during the interview process, and was so distraught "he decided to withdraw his application from consideration for the Administrator position." Am. Compl. ¶ 116. But, contrary to Dew's assertion, while he may have believed the interview on September 4, 2014, was the last step in the hiring process, no one had offered him the job. In other words, no final decision had been made. The Commissioners

**MEMORANDUM DECISION AND ORDER - 14**

needed to meet once again, and Dew was told it could be another week for that to occur.

Yet, like Flowers, Dew voluntarily withdrew his application before any final decision,

rubber stamp or otherwise, occurred. In this context, the Court finds Dew has not alleged

facts or circumstances supporting a finding of adverse action, which is an essential

element of his prima facie case.

*Ruggles v. Cal. Polytechnic State Univ.*, 797 F.2d 782 (9th Cir. 1986), does not

help Dew here. Ruggles worked as a part time instructor for the University. She applied

for a tenure-track position. A few days after the period for submitting applications closed,

the faculty decided to eliminate the position for which Ruggles had applied. Ruggles

sued, alleging discrimination and retaliation based upon the University's failure to hire

her. There, the court explained that, in the context of a retaliation cause of action alleging

a retaliatory failure to hire, the adverse employment decision was the "closing of the job

opening to her and the loss of opportunity even to compete for the position" based upon

her protected activities, which in that case consisted of a prior lawsuit for discrimination.

*Ruggles*, 797 F.2d at 786.

In contrast, Dew has not alleged a retaliatory failure to hire, and thus the standard

considered in *Ruggles* does not apply. And, even if the standard was applicable here, the

facts in *Ruggles* are distinguishable. The position of Administrator was not closed or

otherwise withdrawn to Dew as was the tenure-track position in *Ruggles*. In fact, the

IDOL later completed the decision making process, and hired Linda Goodman. As Dew's

counsel admitted during the hearing, nothing precluded or prevented Dew from

remaining in contention for the position. Rather, after receiving positive feedback from

**MEMORANDUM DECISION AND ORDER - 15**

select Commissioners but before receiving a final response from the Commission, whom he was told needed to meet again, Dew voluntarily withdrew his application.[4] Absent any affirmative action by Edmunds, Parks, the Commission, or anyone else denying Dew the position, the Court cannot on the facts as alleged find Dew could prove he suffered adverse action.[5]

Finally, the Court considers Dew's argument that the futile gesture doctrine provides support for his claims. Dew argues he withdrew his application because he believed continuing with the hiring process would be a "futile gesture," citing *Internat'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 366 (1977), for support. There, the United States Supreme Court considered a class action lawsuit alleging the employer had engaged in a pattern or practice of discrimination such that the employer prevented minorities from applying. The Supreme Court noted:

> To conclude that a person's failure to submit an application for a job does not inevitably and forever foreclose his entitlement to seniority relief under Title VII is a far cry, however, from holding that nonapplicants are always entitled to such relief. A nonapplicant must show that he was a potential

___

[4] The Commission is required to approve the appointment of an administrator. Idaho Code § 67-5905 ("Any decision by the director [of the department of labor] regarding the appointment and tenure of the administrator shall be made with the advice and consent of the commission.").

[5] *See, e.g., Jimenez v. Dyncor Internat'l, LLC*, 635 F.Supp.2d 592, 608 (W.D. Tex. 2009). In that case, a female police officer brought an action against her prospective employer, alleging discrimination on the basis of sex. During the interview process, the plaintiff underwent a psychological evaluation and, during the evaluation, the doctor asked her questions about her looks, her children, and her ability to work in a male-dominated environment. Based upon the evaluation, the doctor recommended the plaintiff not be hired, and she was not. The court found the plaintiff presented sufficient evidence to establish a prima facie case of discrimination based upon gender because of the evaluator's comments, coupled with the decision not to hire her based upon the evaluator's recommendation. 635 F.Supp.2d at 608. Here, in contrast, even if the Court construes the comments made to Dew by Edmunds as reflecting discriminatory animus, there was no adverse action. Neither Parks, Edmunds, nor the Commissioners affirmatively denied Dew the job, as in *Jimenez*.

**MEMORANDUM DECISION AND ORDER - 16**

> victim of unlawful discrimination. Because he is necessarily claiming that he was deterred from applying for the job by the employer's discriminatory practices, his is the not always easy burden of proving that he would have applied for the job had it not been for those practices.

*International Broth. of Teamsters*, 431 U.S. at 367-68. In other words, the plaintiff must establish the inference that individual hiring decisions were made in pursuit of a discriminatory policy so pervasive so as to dissuade persons from applying for the job.[6] *Id.* at 359, 368.

Here, in contrast, the conduct Dew complains of does not meet the threshold in *Teamsters*. He has not identified a discriminatory policy or other pervasive atmosphere of discrimination such that participation in the hiring process itself, or continuation of his competition for the Administrator's position, would have been futile for him. Rather, the facts portray a hiring process and atmosphere devoid of discrimination,[7] unless and until the Court accepts as true, as it must, Dew's impression of Edmunds's individual reaction to Dew during the interview. Even construing Dew's allegations in his favor, they fall far short of supporting an inference that there was any policy or pervasive atmosphere of discrimination effectively preventing disabled or gay individuals from being considered

---

[6] The Court analogizes this theory to a claim of hostile work environment, such that the hiring process itself was permeated with discriminatory animus.

[7] Dew describes the interview process as positive, until he met with Edmunds.

**MEMORANDUM DECISION AND ORDER - 17**

and hired for the Administrator position. Rather, Dew describes the interview process as positive, until he met with Edmunds.[8]

Accordingly, Dew has not pled sufficient facts to state a claim for relief on Counts I and II, and they will be dismissed. Although it does not appear he can plead sufficient facts based upon the record, Dew will nonetheless be given an opportunity to amend as explained below.

### B.   *Count V – Equal Protection Claim of Discrimination on the Basis of Sexual Orientation and Qualified Immunity*

Dew's equal protection claim alleges Edmunds and Parks discriminated against Dew on the basis of his sexual orientation. Am. Compl. ¶ 158. The Equal Protection clause "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985) (quoting U.S. Const., amend. XIV., § 1). Defendants contend they are immune from suit on the basis of qualified immunity.

Rulings on the qualified immunity defense "should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive," because the defense is "an immunity from suit rather than a mere defense to

---

[8] Dew's argument that discovery is necessary for him to learn what Parks and Edmunds discussed after the interview is immaterial to what Dew knew at the time he withdrew his application. In other words, Dew cannot prove futility with the benefit of hindsight. As in *Jimenez*, to justify the inference that Edmunds's comments were discriminatory in nature, adverse action (an affirmative denial of the position) is required to support the inference—not Dew's speculation that there would have been adverse action. The same is true regarding Mackey's comments about Parks's reference inquiry notes. *Iqbal* and *Twombly* require more than speculation. Adverse action—an affirmative act denying Dew the position—is therefore required to move the allegations beyond mere speculation.

liability." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). A motion to dismiss on grounds of qualified immunity may be granted where the allegations on the face of the complaint, taken as true, are sufficient to show that the qualified immunity test is met. *See Cooper v. Pickett*, 137 F.3d 616, 622 (9th Cir. 1997). However, an opportunity to amend to state a plausible claim must generally be provided to a plaintiff if qualified immunity is asserted in a motion to dismiss. *See Moss v. U.S. Secret Service*, 572 F.3d 962, 974–75 (9th Cir. 2009).

The doctrine of qualified immunity protects state officials from personal liability for on-the-job conduct so long as the conduct is objectively reasonable and does not violate an individual's clearly-established federal rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Contrarily, a state official may be held personally liable in a § 1983 action if he knew or should have known that he was violating a plaintiff's clearly-established federal rights. *Id.* True to its dual purposes of protecting state actors who act in good faith and redressing clear wrongs caused by state actors, the qualified immunity standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quotation omitted). Qualified immunity is a defense both to constitutional claims and to statutory claims. *See Lovelace v. Lee*, 472 F.3d 174, 198-99 (9th Cir. 2006).

A qualified immunity analysis consists of two prongs: (1) whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [defendant's] conduct violated a constitutional right" ; and (2) whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified by Pearson v.*

**MEMORANDUM DECISION AND ORDER - 19**

*Callahan*, 555 U.S. 223, 129 S. Ct. 808 (2009). Addressing the two prongs of the test in this order is often beneficial, but it is not mandatory. Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S. Ct. at 818.

To determine whether the right was clearly established, the Court turns to Supreme Court and Ninth Circuit law existing at the time of the alleged act. *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996). In the absence of binding precedent, the courts should look to available decisions of other circuits and district courts to ascertain whether the law is clearly established. *Id.*

The inquiry of whether a right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. For the law to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand" that his conduct violates that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). It is not necessary that the "very action in question has previously been held unlawful," but "in the light of pre-existing law the unlawfulness must be apparent" to the official. *Id*. A court need "not require a case directly on point;" however, "existing precedent must have placed the statutory or constitutional question beyond debate," for a court to conclude that qualified immunity does not apply. *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011). "The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his

conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

Defendants claim they are entitled to qualified immunity because the right to be free from discrimination in employment based on sexual orientation was not clearly established at the time of the alleged conduct, and because the facts do not establish a constitutional violation. In response, Dew argues that, under *SmithKline Beecham Corp. v. Abbott Labs*, 740 F.3d 471, 483 (9th Cir. 2014), and this Court's decision in *Latta v. Otter*, 19 F.Supp.3d 1054 (D. Idaho May 13, 2014), *cert. denied*, *Otter v. Latta*, 135 S.Ct. 2931 (June 30, 2015), the constitutional right to be free from discrimination based on sexual orientation during the hiring process was clearly established in the Ninth Circuit at the time of the alleged conduct.

As explained above, the Court has found that the facts as alleged in the Amended Complaint, if proved, would not support a finding of adverse action. Without such facts, the Court cannot find a constitutional violation. However, even if the facts supported such a finding, the Court disagrees with Dew's assertion that the law regarding sexual orientation discrimination in the employment context was clearly established at the time Dew applied for the Administrator position in September of 2014.

Dew's response to Defendants' motion highlights the tumultuous times surrounding LGBT rights in Idaho, both during the time of his application and continuing to the present. Dew notes Parks was outspoken during the late fall of 2013, advocating in support of the "Add the Words" campaign for including sexual orientation as a protected

**MEMORANDUM DECISION AND ORDER - 21**

class for employment, housing, and other civil rights in Idaho.[9] No such law has been adopted by the Idaho Legislature,[10] and Parks's endorsement in the face of the defeat of the Add the Words campaign hardly suggests clearly established law. Further, it was not until July of 2015 that the United States Equal Employment Opportunity Commission[11] ruled in a groundbreaking decision that sexual orientation discrimination by Federal employers is barred by existing Title VII law.[12] Given the turbulent Add the Words campaign, and the lack of any legislative action, it can hardly be said that reasonable officials would undoubtedly have known that discrimination based upon sexual orientation during the hiring process violated clearly established rights.

Dew's reliance upon *SmithKline*, issued January 21, 2014, and this Court's decision in *Latta*, issued May 13, 2014, as a basis for his argument that the law was clearly established by the fall of 2014 when Dew submitted his application, stretches those decisions too far. While Dew is correct that *SmithKline*, a case about discriminatory jury selection based upon sexual orientation, subjected such classifications to heightened scrutiny, the case is limited to its context. *SmithKline* addressed purposeful discrimination and the perpetuation of impermissible stereotypes in the context of a

---

[9] In fact, Dew cites Parks's outspoken public support for LGBTQ individuals during October and November of 2013, including her public statements that sexual orientation should be considered a protected class. Response at 15. (Dkt. 25.)

[10] In contrast, a growing number of municipalities in Idaho have adopted such ordinances.

[11] The EEOC's rulings are not binding upon Federal Courts. *Univ. of Tennessee v. Elliott*, 478 U.S. 788, 793 (1986); *N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 780 (9th Cir. 2011) (agency's construction of a statute merits "some deference" but is not binding).

[12] *Baldwin v. Foxx*, EEOC Appeal No. 0120133080, 2015 WL 4397640 (July 15, 2015).

**MEMORANDUM DECISION AND ORDER - 22**

*Batson* challenge during jury selection. *Latta v. Otter*, 19 F.Supp.3d at 1076 (D. Idaho 2014). *SmithKline* did not, however, indicate that the level of scrutiny applied in the context of a *Batson* challenge applies to every case of alleged sexual orientation discrimination.

Similarly, *Latta*, and by extension, *Obergefell v. Hodges*, 135 S.Ct. 2584 (June 26, 2015), do not establish a broad right to be free from sexual orientation discrimination in all contexts. Rather, *Latta* and *Obergefell* involved sexual orientation discrimination in the context of categorical denials of the right to marry and substantive due process under the Fourteenth Amendment to the United States Constitution. Here, there is no evidence of any policy, rule or law imposed or followed by the Idaho Commission on Human Rights or the Department of Labor that precluded the employment of gays or lesbians. Instead, the evidence put forth by Dew himself supports the inference that Parks, personally and on behalf of the ICHR, believed the law should protect LGBT individuals from discrimination in employment and was advocating for such protections under Idaho law. This alone confirms the law was not clearly established at the time Dew applied for the Administrator's position.[13]

The mere fact that *SmithKline* and *Latta* had been decided prior to Dew's employment interviews in August of 2014 does not establish reasonable officials in Parks's or Edmunds's positions would have known their alleged conduct during the hiring process was clearly unconstitutional. In fact, the debate continues, both in Idaho

---

[13] In other words, the Court is aware of no specific right to a hiring process blind to Dew's sexual orientation, nor has Dew cited to any authority establishing such a right.

**MEMORANDUM DECISION AND ORDER - 23**

and elsewhere, regarding sexual orientation discrimination in contexts such as employment, housing, and consumer services.[14] *Al-Kidd*, 131 S.Ct. at 2083 (constitutional question must be "beyond debate" to support a finding that every reasonable official would know that what he is doing violates a constitutional right).

Consequently, even if the Court found Dew has alleged facts that could prove a constitutional violation (which it did not), Parks and Edmunds would be entitled to qualified immunity with respect to Dew's § 1983 Equal Protection claim asserted in Count V.

### C.    *Count III – State Law Claim for Emotional Distress*

Dew's third cause of action raises a state law claim for negligent infliction of emotional distress. Defendants argue, because all of the constitutional and statutory claims should be dismissed, the Court should not exercise supplemental jurisdiction over the remaining state law claim. Dew agrees that his emotional distress claim is subject to

---

[14] In fact, one has only to perform a Google search for "debate continues regarding sexual orientation discrimination" to find a host of articles from around the country discussing the debate over sexual orientation discrimination. The three cited here are the top ranking articles resulting from that search performed on October 7, 2015, at www.google.com: Jason Hancock, *Heated Gay Rights Debate Continues in Missouri and Many Other States*, THE KANSAS CITY STAR (April 19, 2015), http://www.kansascity.com/news/government-politics/article18993843.html ("29 states — including Missouri and Kansas— have no statewide law barring discrimination on the basis of sexual orientation or gender identity. That means a person can be fired from a job, evicted from an apartment or kicked out of a restaurant for being gay or being perceived to be gay.") (article attached); Hayley Miller, *Following SCOTUS Ruling, Michigan Continues Debate on Discriminatory Religious Freedom Bill*, Human Rights Campaign Blog (July 1, 2015), http://www.hrc.org/blog/entry/following-scotus-ruling-michigan-continues-debate-on-discriminatory-religio; Zac Anderson, *Gay Marriage Debate Continues in Florida*, HERALD-TRIBUNE (March 13, 2015), http://politics.heraldtribune.com/2015/03/13/gay-marriage-debate-continues-in-florida/ (article attached).

dismissal if his ADA, Title VII, IHRA, and Equal Protection claims are dismissed. Response at 16. (Dkt. 25.)[15]

Supplemental jurisdiction exists where jurisdiction is exercised over a claim that is part of the same case or controversy as another claim over which the court has original jurisdiction. BLACK'S LAW DICTIONARY, p. 931, 9th ed.; *see also* 28 U.S.C. § 1367. Section 1367(c) identifies four grounds for declining supplemental jurisdiction where the claim raises a novel or complex issue of state law; the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; the district court has dismissed all claims over which it has original jurisdiction; or in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c).

Here, the state law claim for emotional distress is inextricably intertwined with Dew's ADA, Title VII, and Section 1983 claims. Dew alleges the manner in which Defendants treated him caused him emotional distress. Dew concedes if his federal claims are dismissed, then the underpinning for the negligent infliction of emotional distress claim evaporates. Because the Court determines Counts I, II, and V are subject to dismissal, so too is the emotional distress claim. Therefore, the Court need not reach Defendants' additional arguments, which assert sovereign immunity, immunity from liability under the Idaho Tort Claims Act, and failure to allege sufficient facts to establish a claim for negligent infliction of emotional distress.

---

[15] Dew has a lawsuit pending in state court as well. To the extent he is pursuing a claim for infliction of emotional distress in state court, the dismissal will be without prejudice.

**MEMORANDUM DECISION AND ORDER - 25**

## CONCLUSION

For the reasons explained herein, Dew's claims pled in Counts I, II, III, and V in this matter will be dismissed. Count IV will be dismissed based upon Dew's voluntary withdrawal of the same. If Dew can, within the guidelines explained by the Court, sufficiently plead facts to establish his claims, he may file an amended complaint within thirty days. However, it may be exceedingly difficult to state a claim based upon the facts alleged. This is not a case where more detail would suffice. But, in light of Ninth Circuit precedent, the opportunity to do so will not be foreclosed.

## <u>ORDER</u>

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)  Defendants' Motion to Dismiss (Dkt. 19) is **GRANTED,** and the Amended

    Complaint (Dkt. 4) is **DISMISSED without prejudice.**

2)  Plaintiff may file an amended complaint by **November 6, 2015**. If Plaintiff

    does not amend his Complaint within that time period, Counts I, II, IV, and

    V will be dismissed with prejudice, and Count III will be dismissed without

    prejudice.

Dated: **October 08, 2015**

Honorable Candy W. Dale
United States Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 27**